UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 14-23908-CV-SEITZ/TURNOFF

JEFFREY MASON,
      Plaintiff,

v.

THE CITY OF MIAMI GARDENS, FLORIDA,
      Defendant.

_____/

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant, City of Miami Garden's Motion for

Summary Judgment [DE-43]. Defendant seeks summary judgment on Plaintiff's two remaining

claims[1] for race-based retaliation: (1) in violation of the Civil Rights Act of 1866, 42 U.S.C. §

1981 and 42 U.S.C. § 1983 and (2) in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e, *et seq.*, and the Florida Civil Rights Act (FCRA), Fla. Stat. § 760.11. Plaintiff

brought his retaliation claims after being terminated from Defendant's (the City's) police

department, where he was an officer. According to Plaintiff, his termination and prior

disciplinary actions were the result of his speaking out within the police department and publicly

about the police department's policies towards Black members of the community.

In late 2013, local media began reporting that the City had a policy of unlawfully

stopping, searching, and detaining members of the community based on their race. Plaintiff, with

his identity disguised, appeared on one of the news broadcasts confirming the existence of the

policy. According to Plaintiff's complaint he had been internally complaining about the policy

since its inception. Plaintiff maintains that as a result of his internal complaints he became the

_____

[1] Plaintiff previously voluntarily dismissed all other claims.

subject of frivolous disciplinary actions and that he and other Black officers who objected to the policies were punished for not being "team players."  Shortly after the story broke in the media, a civil rights lawsuit was filed in this district, *Sampson v. City of Miami Gardens*, Case No. 13-24312, by members of the community who asserted that they had been targeted by the police department's illegal policy.  Plaintiff was subpoenaed for a deposition in the *Sampson* case and, shortly after giving testimony corroborating the *Sampson* plaintiff's claims, Plaintiff was terminated.  This suit, alleging claims of racial discrimination, retaliation, and wrongful termination, followed.  Plaintiff subsequently dismissed many of the claims, including the racial discrimination claims, leaving only the retaliation claims under §§ 1981 and 1983, Title VII, and the FCRA.

The City maintains that it is entitled to summary judgment on the remaining retaliation claims because Plaintiff's actions which led to the alleged retaliation are not protected activity under the statutes, Plaintiff cannot establish a causal connection between any protected activity and any adverse employment actions, and Plaintiff cannot demonstrate that the City's reasons for its employment actions are pretextual.  Because the applicable law[2] does not protect many of Plaintiff's allegedly protected activities and because Plaintiff has not demonstrated that the City's proffered reasons for its actions are pretext, summary judgment is granted as to Plaintiff's remaining retaliation claims.

---

[2]Plaintiff chose to sue under §§ 1981 and 1983, Title VII, and the FCRA.  Thus, this action is limited by the protections offered by those statutes.  The statutes do not protect against generally wrongful or spiteful actions; they protect only against those actions specifically set forth in the statutes.  *Crowley v. Prince George's County, Maryland*, 890 F.3d 683, 687 (4th Cir. 1989).

## I.    UNDISPUTED MATERIAL FACTS[3]

In October 2007, the City hired Plaintiff, who is African-American, to serve as a Sergeant

in its newly formed police department.  Prior to that, Plaintiff had served more than 21 years in

the City of Philadelphia Police Department, where he retired as a Sergeant.  When the City's

police department became operational in December 2007, Plaintiff served as a Sergeant

overseeing a group of road patrol officers and performed administrative and operational duties.

**The City's Policing Policies and Plaintiff's Response**

Beginning in 2008,[4] Plaintiff maintains that the City's police officers were told that they

would be evaluated based on their amount of "self-initiated" activity, which included having

field interviews without the required reasonable suspicion or probable cause.  (DE-53-20 at 2.)

Thus, officers would be evaluated based on the number of stops they made (the Quota Policy).

(DE-53-20 at 2.)  Plaintiff spoke out against this practice at a supervisors' meeting.  (DE-53-20 at

2.)  Between 2008 and 2012, Plaintiff continued to speak out about this practice and alleges that,

as a result, he was subject to frivolous discipline.  (DE-53-20 at 2.)  In 2012, Plaintiff alleges that

officers were instructed to stop Black males between the ages of 15 and 30 within the City.  (DE-

53-20 at 2.)  Plaintiff's commanding officer told him that Plaintiff's colleagues felt that Plaintiff

was not a "team player" because he opposed this racial profiling and the Quota Policy.  (DE-53-2

---

[3]No record citations are included where Plaintiff and the City agree on the facts.

[4]The facts in this paragraph regarding the City's Quota Policy and policing tactics were
the underlying basis of the *Sampson* suit.  After the granting of partial summary judgment but
before trial, the *Sampson* case settled.  Thus, many of the facts remain disputed.  However,
Plaintiff maintains that his actions in relation to the City's policing policies are integral to
understanding the City's actions towards Plaintiff.  Consequently, the facts are included here.
Their inclusion here does not indicate that the Court has made any finding as to their veracity.

at ¶13.)  Plaintiff continued to take a stand against these policing tactics and, as a result, the discipline continued.  (DE-53-20 at 2.)

In mid-2013, Plaintiff and other minority officers formed the "Concerned Black Police Officer's Association."  (DE-53-2 at ¶23.)   On May 28, 2013, Plaintiff and other Black officers met with Assistant City Manager Nelson to discuss the City's Quota Policy, policing tactics aimed at the Black community, and treatment of Black police officers within the police department.  (DE-53-2 at ¶24.)  In October 2013, Plaintiff appeared on television news stories about the City's policy of unlawful stops and searches based solely on the person's race.  (DE-53-2 at ¶29.)  On November 27, 2013, the City's policing tactics became the subject of a civil rights lawsuit, the *Sampson* case.  On May 29, 2014, Plaintiff was subpoenaed to testify at a deposition in the *Sampson* case.  (DE-53-2 at ¶39.)   On June 12, 2014, Plaintiff was deposed and gave testimony adverse to the City.  (DE-53-2 at ¶39.)  Four days later, Plaintiff was terminated.

**The City's Disciplinary Policies and Plaintiff's Disciplinary and Counseling History**

The City has an established Employee Dispute Resolution Procedure.  (DE-45-4.)  Under the policy, the City Manager is the final arbiter and decision maker.  (*Id.*)  The policy uses progressive discipline, beginning with a written reprimand for a first offense, escalating to a possible suspension for a second offense, and ending with the possibility of termination for a third offense.  (DE-45-5.)  The City's police department may have even followed a more stringent policy.  (DE-53-34 at 24:10-25:8.)  The City also has a policy against unlawful sexual harassment and discrimination. (DE-45-6.)  The policy prohibits sexual harassment and retaliation against an employee who reports unlawful harassment.  (*Id.*)

*Plaintiff's Early Discipline and Counseling*

After less than a year on the job, Plaintiff's supervisor, Captain Alfred Lewers, developed concerns about: (1) the accuracy of Plaintiff's administrative paperwork, (2) the time it took Plaintiff to complete tasks, and (3) Plaintiff's ability to manage his administrative time and responsibilities. As a result, on July 26, 2008, Captain Lewers placed Plaintiff on a 28-day administrative performance plan. In October and November 2008, Plaintiff failed to completely perform his administrative duties. Consequently, on November 23, 2008, Plaintiff received a Disciplinary Action Report from Captain Lewers. The Disciplinary Action Report noted that Plaintiff had already received coaching, mentoring, and counseling sessions on how to complete his administrative tasks but was still failing. As a result, Plaintiff received a one-day suspension.

Less than three months later, on February 8, 2009, Plaintiff received a Disciplinary Action Report after he failed to properly review an arrest warrant written by an officer under his command. In the Disciplinary Action Report, Plaintiff was warned that progressive discipline would follow if similar incidents occurred. Plaintiff contends that he received this Disciplinary Action Report because the person arrested was related to the City's Mayor, not because of Plaintiff's race or age.

Two weeks later, on February 22, 2009, Plaintiff was accused of using excessive force while making an arrest. After an internal affairs investigation, the allegations against Plaintiff were not sustained. Three and a half months later, on June 10, 2009, Plaintiff received a Record of Counseling, which is not the same as a Disciplinary Action Report, after he failed, on four separate occasions, to appear for a deposition in a criminal case.

5

### *Plaintiff's Continuing Counseling and Discipline*

While the record indicates that Plaintiff had no disciplinary problems for the next two years, in 2011, Plaintiff had two Records of Counseling and a Disciplinary Action Report. On May 26, 2011, Plaintiff received a Record of Counseling after he was determined to be at fault for a motor vehicle accident while operating a City patrol car. On September 6, 2011, Plaintiff received a second Record of Counseling because he failed to notify the chain of command in a timely matter of a motor vehicle crash involving one of his subordinate officers and failed to enter information about the crash into the police department's Daily Bulletin.

On September 19, 2011, Plaintiff received a Disciplinary Action Report for failing to notify the chain of command in a timely manner about damage to a prisoner transport van he had been summoned to take pictures of by a subordinate officer. While Plaintiff verbally notified his Chain of Command, he never entered the incident into the Daily Bulletin. As a result he received a written reprimand. (DE-45-16.) Plaintiff maintains that he instructed the subordinate officer to report the incident to her direct supervisor. (DE-53-62.)

### *Plaintiff's Discipline in His Final Eighteen Months*[5]

While there was no counseling or Disciplinary Action Reports in 2012, on January 29, 2013, Plaintiff received another Disciplinary Action Report which recommended a ten-day suspension based on the nature of the offense and Plaintiff's prior disciplinary history. (DE-45-18.) This Disciplinary Action Report arose from an incident that occurred on September 24, 2012, when Plaintiff went to the police department's Communications Center. According to the

---

[5]The summaries of the incidents leading to the complaints against Plaintiff come primarily from transcripts of the investigation interviews, which Plaintiff submitted, not from the summaries prepared by the investigators.

investigation report prepared by Major Lewers, Plaintiff went to the Communications Center to

obtain information from another law enforcement agency but remained in the Communications

Center for a prolonged period of time after obtaining the information.  (DE-45-17.)  During this

time, Telecommunicator Alexia Sosa stated that she no longer wished to watch the show that was

on the television and asked Telecommunications Supervisor Sherell Washington to change the

television station.  (DE-53-4 at 8.)  At that point, Plaintiff got up, walked over to where the

television remote controls were located, picked up both remotes, and walked back to where he

had been seated.  (*Id.* at 8-9.)  Supervisor Washington walked toward Plaintiff to recover the

remotes.  (*Id.* at 9.)  Plaintiff then stood up, unzipped his pants, and placed both remotes through

the zipper opening into the crotch area of his pants.  (*Id.* at 9, 19, 47-48.)  Supervisor Washington

demanded that Plaintiff remove the remote controls and leave the Communications Center or she

would call Plaintiff's supervisor, Captain Martinez. (*Id.* at 9.)  At first Plaintiff ignored this

request but after a few minutes he removed the remotes and returned them.  (*Id.* at 9, 48-49.)

While Communicator Sosa did not see Plaintiff put the remotes in his pants, she did see him

walking with his hands in front of his thighs like he "put something there and he was trying to

keep it up." (*Id.* at 36.)  Shortly after, Captain Martinez arrived, having been called by Sosa at

Washington's request.  (*Id.* at 2, 36-37.)  Later, as Plaintiff began walking out of the

Communications Center another Telecommunicator noticed and loudly stated to the room's

occupants that Plaintiff's pants were still unzipped.  (*Id.* at 3, 13, 27, 39, 50.)  At that time

Plaintiff's back was to Captain Martinez but Captain Martinez noticed that Plaintiff's hands were

in front of his pants in the zipper area and when he turned around to face Captain Martinez his

zipper was up. (*Id.* at 3, 27.)  During the investigation, Mason claimed that his zipper was

broken and that he had put the remotes in his pockets.  (*Id.* at 61, 66.)  Mason challenged the suspension but it was upheld.

On March 12, 2013, Plaintiff was issued a second Disciplinary Action Report for failing to notify the command staff that an officer under Plaintiff's command had flattened four tires on a City-issued vehicle.  The Report recommended a one-day suspension based on the fact that twice before Plaintiff had failed to notify his chain of command about vehicle damage.  (DE-45-19.)  Plaintiff responded to the Report in writing, stating that he did not know that tire damage had to be reported up the chain of command.  (DE-53-62.)

On April 29, 2013 Communicator Sosa was asked to send an email to Plaintiff.  Sosa indicated to her supervisor that she was uncomfortable communicating with Plaintiff based on events that had occurred on April 18, 2013.  Sosa's supervisor reported the April 18, 2013 events through the chain of command resulting in an internal investigation.  The investigation showed that, on April 18, 2013, Plaintiff made a comment to Sosa about a picture she had posted on Facebook, in which she was wearing a swimsuit.  Specifically, Plaintiff said, "Hey was that you in the picture . . .the Facebook picture, the one showing the tits?"  (DE-45-21.)  Plaintiff then made another comment while staring at Sosa's chest: "Oh yeah, I see they are much bigger now . . . I can see the difference."  (*Id.*)  Sosa also complained that Plaintiff had said uncomfortable things to her in the past, including calling her "stupid" and telling her that "if she dived into a lake or ocean she would kill all the fish."  (*Id.*)  Two other witnesses heard the fish comment. Sosa interpreted that comment to mean that she stinks and is no good.  (*Id.*)  As a result of the comments, Sosa stated that she was uncomfortable around Plaintiff which was affecting her job. (*Id.*)  None of the witnesses present heard Plaintiff's comments about Sosa's breasts.  However,

8

witnesses heard snippets of the conversation including Plaintiff saying "it's on Facebook" and Sosa saying "Thanks for calling me out." (*Id.* at 79, 87.) One of the witnesses did not hear these comments but recalled other times when other female officers would look at Plaintiff and roll their eyes or put their heads down as if upset or disgusted because of some remark Plaintiff made that could be construed as sexual in nature or "off-color." (*Id.* at 88-89.) Plaintiff denied making these comments about Sosa's breasts and did not recall making the fish comment. During the course of the investigation regarding Plaintiff's comments to Sosa, Sosa revealed that approximately nine months earlier she had taken a picture of Plaintiff sleeping on the job. That led to the City opening a separate investigation into whether Plaintiff had been sleeping on the job.

As a result of the two investigations begun in 2013, Plaintiff received two Disciplinary Action Reports on October 4, 2013, one for sleeping on the job and one for creating a sexually hostile work environment. The City's policy is that it cannot sustain a harassment complaint in a he said/she said situation without corroborating witnesses. (DE-19 at 51:9-19.) According to the Disciplinary Report, while Sosa's complaint could not be corroborated, there was sufficient evidence to support a finding that Plaintiff had created a harassing environment by making sexual comments. (DE-45-24.) As a result of the findings in the two Disciplinary Action Reports, Plaintiff was recommended for a demotion.

Six days after receiving the two Disciplinary Action Reports, Plaintiff submitted a "Response to Disciplinary Action Reports," which included a DVD video of Sosa participating in an adult film that had been created before her employment with the City. On October 15, 2013, Sosa submitted a complaint to her supervisor after she learned that Plaintiff had displayed the

adult video to other officers. Sosa's complaint stated that she feared for her safety. The City

commenced an investigation. The investigation revealed that Plaintiff had shown the video to a

subordinate officer on October 9 or 10, 2013. Plaintiff alleges that he showed the video to the

subordinate in order to confirm Sosa's identity. However, there is no dispute that Plaintiff

personally knew Sosa. The investigation found that Plaintiff had disseminated the video to

retaliate against Sosa for her prior complaints about Plaintiff and that Plaintiff had created a

hostile and harassing work environment for Sosa. (DE-45-31.) As a result, on March 5, 2014,

the City issued a Disciplinary Action Report to Plaintiff which recommended termination and

Plaintiff was placed on administrative leave. (DE-45-35.)

During the investigation arising from the dissemination of the video, Plaintiff challenged

the October 4, 2013 Disciplinary Action Report recommending demotion. On January 28, 2014,

Plaintiff submitted correspondence to the City stating that he had been subjected to a series of

frivolous write-ups because he had taken a stance against the City's allegedly unlawful policy to

violate the constitutional rights of the public by initiating stops to fulfill department quotas. (DE-

45-28.) Plaintiff also alleged in the statement that he had suffered disparate treatment on the

basis of race. (*Id.*) Also during that time period, the City received a letter from the Equal

Employment Opportunity Commission (EEOC), requesting information relating to the charge of

discrimination Plaintiff filed against the City in December 2013. (DE-53-21.) The letter

included a copy of Plaintiff's charge which states that: "I have been subjected to age, race and

retaliation. I have been recommended for demotion in retaliation for stating [sic] up against the

administration/superiors who were ordering officers to violate black citizens' civil rights." (*Id.*)

On January 30, 2014, the City decided to uphold Plaintiff's demotion. An appeal hearing

10

relating to the demotion was held on February 21, 2014.  Following the hearing, on February 24, 2014, City Manager Benson decided to uphold the demotion recommendation based on Plaintiff's past disciplinary history and the severity of the offense.  (DE-45-32.)  Thereafter, on June 16, 2014, Plaintiff was advised by City Manger Benson that Plaintiff was being terminated effective that day based on his disciplinary history and the recommendation in the March 5, 2014 Disciplinary Action Report relating to the dissemination of the Sosa video.

**Plaintiff's Lawsuit**

Four months after being terminated, Plaintiff filed suit on October 22, 2014.  Plaintiff's original complaint alleged a cause of action under § 1983 and a cause of action under Florida's Whistleblower's Act.  Plaintiff subsequently amended the complaint to include claims for retaliation under §§ 1981 and 1983, Title VII, the FCRA, and the Florida Public Whistleblower Act; claims for racial discrimination under §§ 1981 and 1983 and the FCRA; and a claim for wrongful termination under Florida law.  By his Fourth Amended Complaint, Plaintiff had dismissed all claims except a retaliation claim under §§ 1981 and 1983 and a retaliation claim under Title VII and the FCRA.

According to Plaintiff, the City retaliated against him for eight specific acts:

1. From January 2010 through February 2012, Plaintiff repeatedly voiced his concerns that the Department's racial targeting policy violated the civil rights of the citizens of the community.

2. In February 2012, Plaintiff complained to Captain Martinez about the racial profiling.

3. In May and June of 2013, Plaintiff and other officers formed the Concerned Black Police Officer's Association and would have meetings with residents and business owners.

4. On May 28, 2013, Plaintiff lead a meeting of the Concerned Black Police Officer's

11

Association where the discrimination towards Black community members, the lack of Black officers in the department, and the retaliation faced by Black officers for not being team players as to the racial profiling and stop and frisk practices were discussed with the Assistant City Manager.

5. In November 2013, Plaintiff appeared on a news broadcast where he confirmed the unlawful stopping, searching, and detention of members of the community based on their race.

6. In December 2013, Plaintiff filed an EEOC charge.

7. On January 28, 2014, Plaintiff sent a letter with a copy of the EEOC charge to the City's Human Resources Department and to the City Manager.

8. On June 12, 2014, Plaintiff gave adverse deposition testimony in the *Sampson* case regarding the department's racial discrimination and profiling.

(DE-56 at pp. 5-6.)

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting* Fed. R. Civ. P. 56(e)). The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (*quoting Anderson*, 477

U.S. at 251-52)).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

## III.    DISCUSSION

The parties agree that this is a case based on circumstantial, not direct, evidence. To establish a prima facie case of retaliation based on circumstantial evidence, a plaintiff must show: (1) that he engaged in statutorily protected expression; (2) that he suffered an adverse employment action; and (3) that there is some causal relationship between the two events.[6] *Hollifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997). After a plaintiff establishes a prima facie case, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the employer's actions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03

---

[6] When § 1983 is used as a parallel remedy for violation of Title VII, the elements of the two causes of action are the same. *Cross v. Alabama, State Department of Mental Health & Mental Retardation*, 49 F.3d 1490, 1508 (11th Cir. 1995). Identical methods of proof, as described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), are used. *Richardson v. Leeds Police Department*, 71 F.3d 801, 805 (11th Cir. 2000). Consequently, if Plaintiff fails to establish his Title VII claim, his § 1983 claim also fails. Additionally, because the FCRA is patterned on Title VII, under Florida law, decisions construing Title VII are applicable to and guide the analysis of claims under the FCRA. *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1387, 1389 (11th Cir. 1998). Thus, the legal framework for the analysis of Plaintiff's claims under §§ 1981 and 1983, Title VII, and the FCRA is the same.

(1973).  If the employer offers such a reason, the burden shifts back to the plaintiff to show that the employer's reason was pretext for prohibited discrimination. *Id.* at 804.  To avoid summary judgment in such cases, a plaintiff must introduce significantly probative evidence that the proffered reason for the employment action is both false and that discrimination is the real reason for the action.  *Brooks v. County Commission of Jefferson County, Alabama*, 446 F.3d 1160, 1163 (11th Cir. 2006).  To do this, a plaintiff must "demonstrate[] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. State of Alabama State Tenure Commission*, 405 F.3d 1276, 1289 (11th Cir. 2005).

The City seeks summary judgment on five grounds: (1) Plaintiff did not engage in protected activity; (2) Plaintiff cannot establish a causal connection between any protected activities and an adverse employment action; (3) Plaintiff cannot establish "but-for" causation; (4) Plaintiff cannot establish pretext; and (5) Plaintiff cannot establish an unconstitutional City policy or custom.  Because six of the eight allegedly protected activities in which Plaintiff partook are not protected activities under Title VII, summary judgment is granted as to those activities.  As to the remaining two protected activities, because Plaintiff cannot establish that the City's proffered legitimate, non-discriminatory reasons for its actions are pretext, summary judgment is granted as to those activities.

### A.   Summary Judgment is Granted as to those Activities that Are Not Protected Under Title VII

The City maintains that Plaintiff did not engage in any activities that Title VII protects.

Thus, it is entitled to summary judgment.  Title VII protects two types of activities: (1) opposing

an unlawful employment practice under the statute[7] or (2) charging, testifying, assisting, or

participating in any manner in an investigation, proceeding, or hearing under Title VII.  42

U.S.C. § 2000e-3(a).  The City maintains that Plaintiff's complaints arise from Plaintiff's

opposition to the alleged Quota Policy and racial profiling policy.  According to the City, these

policies were not employment practices because they were directed at the public, not employees.

Hence, opposing these policies is not protected activity under Title VII, which only protects

employees, not the public, from discriminatory treatment.  Plaintiff counters that the City is

viewing his complaints too narrowly and asserts that he has alleged eight specific activities, set

out above, that Title VII protects.

Plaintiff contends that the law is clear that requiring a Black employee to discriminate

against other Blacks in the community creates a racially hostile working environment prohibited

by Title VII.  Plaintiff cites to a single case in support of this proposition, *Moyo v. Gomez*, 40

F.3d 982 (9th Cir. 1994).  *Moyo*, however, is inapposite for several reasons.  First, overlooking

---

[7]Title VII states:

It shall be an unlawful employment practice for an employer--

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate
against any individual with respect to his compensation, terms, conditions, or privileges
of employment, because of such individual's race, color, religion, sex, or national origin;
or

(2) to limit, segregate, or classify his employees or applicants for employment in any way
which would deprive or tend to deprive any individual of employment opportunities or
otherwise adversely affect his status as an employee, because of such individual's race,
color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

15

the fact that *Moyo* dealt with the sufficiency of pleadings to survive a motion to dismiss, *Moyo* simply held that allegations that the plaintiff was fired because he refused to carry out a discriminatory policy set forth a "plausible *theory*" for a racially based *harassment* claim.  *Id.* at 986 (first emphasis in original, second emphasis added).  Here, Plaintiff has not alleged a harassment claim or even a hostile work environment claim; he has alleged retaliation claims, which require taking part in protected activity.  Thus, even if *Moyo* did clearly hold that requiring Black employees to discriminate against other Blacks in the community constitutes racial harassment of the employees, it would not support Plaintiff's **retaliation** claims, if Plaintiff had not previously complained of racial harassment or a hostile work environment.  If Plaintiff had complained to the City that the racial profiling and stop and frisk policies created a hostile work environment for him, or other Black officers, and then he suffered retaliation, he might have a claim based on *Moyo*.  However, Plaintiff has not pointed to any record evidence that he made such a complaint to the City.[8]  Consequently, *Moyo* is not applicable to the facts in this case.

Moreover, three other circuit courts that have looked at this issue at the summary judgment stage have found that complaining about racial discrimination directed by the employer towards non-employees is not a protected activity under Title VII because such discrimination is not an employment practice.  In *Bonn v. City of Omaha*, 623 F.3d 587 (8th Cir. 2010), the Eighth Circuit held that Title VII prohibits retaliation only when it is motivated by an employee's opposition to discriminatory employment practices, not when an employee opposes a police department's policing practices.  Similarly, the Second Circuit held that an employee of the

_____

[8]While Plaintiff asserts that he complained that the City retaliated against Black officers for not being "team players" as to the racial profiling and stop and frisk practices, such complaints are not protected, as set forth in detail below at pages 18-19.

police department who presented evidence of other police offices acting in a discriminatory manner toward the public, but offered no evidence of unlawful discrimination with respect to the terms and conditions of employment within the police department, had not presented a cognizable retaliation claim under Title VII because his "opposition was not directed at an unlawful *employment practice* of his employer." *Wimmer v. Suffolk County Police Department*, 176 F.3d 125, 135 (2d Cir. 1999) (emphasis in original); *see also Crowley v. Prince George's County, Maryland*, 890 F.2d 683 (4th Cir. 1989) (holding that investigating instances of racial harassment perpetrated by police officers against members of the community was not a protected activity under Title VII because it was not an employment practice).

Under these holdings, most of Plaintiff's allegedly protected activities do not qualify as such because they are not about the City's employment practices.  Clearly, the following four activities relate to the City's profiling and Quota Policies but not to the City's employment practices:

> 1.  From January 2010 through February 2012, Plaintiff repeatedly voiced his concerns that the Department's racial targeting policy violated the civil rights of the citizens of the community.
>
> 2.  In February 2012, Plaintiff complained to Captain Martinez about the racial profiling.
>
> 3.  In November 2013, Plaintiff appeared on a news broadcast where he confirmed that unlawful stopping, searching, and detention of members of the community based on their race.
>
> 4.  On June 12, 2014, Plaintiff gave adverse deposition testimony in the *Sampson* case regarding the department's racial discrimination and profiling.

All four of these activities involve Plaintiff complaining about or speaking out about how the City instructed officers to interact with the public; they all are about policing tactics, not unlawful

employment practices. Thus, based on *Bonn, Wimmer,* and *Crowley*, these four activities are not protected under Title VII.

Two other activities also do not qualify as protected activity:

1. In May and June of 2013, Plaintiff and other officers formed the Concerned Black Police Officer's Association and would have meetings with residents and business owners.

2. On May 28, 2013, Plaintiff lead a meeting of the Concerned Black Police Officer's Association where the discrimination towards Black community members, the lack of Black officers in the department, and the retaliation faced by Black officers for not being team players as to the racial profiling and stop and frisk practices were discussed with the Assistant City Manager.

Based on the law and the record evidence, neither of these activities are about the City's employment practices. The first, the formation and meetings of the Concerned Black Police Officer's Association, has nothing to do with the City's employment practices. The second activity, the specific issues addressed at the Concerned Black Police Officer's Association's May 28 meeting, also does not implicate the City's employment practices. As previously set out, the discussions or complaints about the police department's discrimination towards members of the public does not implicate the City's employment polices. While Plaintiff states that at the May 28 meeting the officers discussed the lack of Black officers in the department, such vague statements do not amount to a complaint about a specific employment practice. *See Bonn*, 623 F.3d at 589-91 (report finding that defendant's policing tactics in minority neighborhoods led to members of those communities not choosing policing as a career and a less diverse police force did not amount to direct challenge of a specific unlawful employment practice). Finally, the Concerned Black Police Officer's Association's complaints that they were being targeted for not being "team players" regarding the profiling and Quota Policies are not complaints of retaliation

based on an employment practice.  The officers complained that they were targeted not because they were Black but because they did not, or would not, comply with the City's racial profiling and Quota Policies.  Thus, the officers, Plaintiff included, were not targeted because they complained that the City was discriminating against officers who were Black but because they complained that the City was discriminating against citizens who were Black.  Such a complaint does not address an unlawful employment practice and, therefore, would not be a protected activity.  If, on the other hand, the officers had complained that the profiling and Quota Policies created a hostile work environment and that they were targeted for such complaints, then they would have a valid claim under Title VII because such a complaint would be a protected activity.  However, Plaintiff has not pointed to any record evidence demonstrating that he, or any other officer, complained about a hostile work environment.  Consequently, summary judgment is granted as to these activities because they are not protected under Title VII.

That leaves two activities that may constitute protected activities under Title VII:

1. In December 2013, Plaintiff filed an EEOC charge.

2. On January 28, 2014, Plaintiff sent a letter with a copy of the EEOC charge to Human Resources and the City Manager.

Under the statute, filing an EEOC charge and sending the charge to one's employer would be protected activities.  However, both the letter and the EEOC charge primarily focus on the alleged retaliation against Plaintiff for speaking out "against the administration/superiors who were ordering officer [sic] to violate black citizens' civil rights."  Thus, Plaintiff's letter and his EEOC claim indicate that the EEOC charge is based on his complaints about the City's policing tactics, not about its employment practices.  Nonetheless, because the EEOC charge also states

that Plaintiff was discriminated against based on his age and race, without any other details, the

Court will assume for purposes of this motion that these two activities come within Title VII's

protection.

### B.   Plaintiff Has Established Causation

The City also asserts that Plaintiff cannot establish a causal relationship between his

allegedly protected activities and his firing.  Given that only the filing of the EEOC charge and

sending the charge to the City are protected activities under Title VII, only these two activities

are relevant.  The record evidence is clear that Plaintiff suffered several adverse employment

actions shortly after he sent his EEOC charge to the City.  Consequently, Plaintiff has

established the necessary causation for his prima facie case.

To prove a causal connection between the protected activity and the adverse employment

action, a plaintiff must demonstrate that the protected activity and the adverse action were not

wholly unrelated.  *Farley v. Nationwide Mutual Insurance Co.*, 197 F.3d 1322, 1337 (11th Cir.

2000).  A plaintiff can meet his burden of causation "by showing close temporal proximity

between the statutorily protected activity and the adverse employment action."  *Thomas v.

Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).  However, in the absence of other

evidence tending to show causation, proof of causation based on mere temporal proximity

requires that the proximity be "very close."  *Id.*  Thus, a three to four month disparity between the

statutorily protected activity and the adverse employment action is not enough.  *Id.*  "In the

absence of close temporal proximity between the protected activity and the employer's adverse

action, a plaintiff may be able to establish causation where intervening retaliatory acts

commenced shortly after the plaintiff engaged in a protected activity."  *Boyland v. Corrections*

*Corp. of America*, 390 F. App'x 973, 974-75 (11th Cir. 2010).

Plaintiff filed his EEOC charge in December 2013 and sent a copy of the charge to the City on January 28, 2014. At that time, the City was already investigating Sosa's retaliation complaint against Plaintiff and Plaintiff had already been suspended for the 2013 remote control incident and recommended for demotion based on Sosa's 2013 complaint arising from Plaintiff's inappropriate remarks and on the finding of sleeping on the job. On February 24, 2014, the City Manager informed Plaintiff that he was upholding the recommendation to demote Plaintiff for the inappropriate remarks and for sleeping on the job. On March 5, 2014, the investigation of Sosa's video retaliation complaint against Plaintiff ended with the issuance of a Disciplinary Action Report indicating that Plaintiff would be terminated for conduct that amounted to retaliation and sexual harassment of Sosa. As a result, on March 5, 2014, Plaintiff was placed on Administrative Leave with pay, effective March 7, 2014. Thereafter, on June 16, 2014, Plaintiff was notified by City Manager Benson that his termination was effective as of that date. Thus, less than a month after sending the EEOC charge to the City, Plaintiff's demotion was upheld; approximately five weeks after sending the EEOC charge to the City, the Disciplinary Action Report recommending termination was issued and Plaintiff was placed on administrative leave; and, more than four months after Plaintiff sent the EEOC charge to the City, Plaintiff was actually terminated. Consequently, Plaintiff has established a close temporal proximity between the sending of his EEOC charge to the City and his demotion and placement on Administrative Leave.[9]

---

[9]The City maintains that even if Plaintiff has shown a close temporal proximity between the filing of the EEOC charge and adverse employment actions, Plaintiff has not shown but-for causation. In *University of Texas Southwestern Medical Center v. Nassar*, – U.S. –, 133 S. Ct.

The City also contends that, regardless of any close temporal proximity between Plaintiff's protected activities and any adverse employment actions, Plaintiff cannot show causation because the recommendations and investigations into Plaintiff's activities were already in motion when Plaintiff made his EEOC charge. Employers "need not suspend previously planned [adverse employment actions] upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark County School District v. Breeden*, 532 U.S. 268, 272 (2001). However, while the City had already started its investigation of Sosa's retaliation claims, no Disciplinary Action Report had issued at the time Plaintiff partook in protected activity. Thus, because Sosa's retaliation charge had not yet been sustained, there was no previously planned adverse employment action relating to that investigation at the time Plaintiff partook in protected activity. Consequently, Plaintiff has established his prima facie case because his administrative leave and termination recommendation were not "previously planned" actions when he filed his EEOC charge.

---

2517, 2528 (2013), the Supreme Court clarified that the standard of proof for causation in a Title VII retaliation claim is "but-for" causation, not the lesser causation standard Title VII employs for status-based claims of discrimination. However, because the appeal in *Nassar* arose from a jury decision, it did not address whether a plaintiff had to establish but-for causation at the summary judgment stage. The Eleventh Circuit does not appear to have directly addressed this issue yet. *See Murphee v. Commissioner*, – Fed. App'x – , 2016 WL 827318, *5 (11th Cir. Mar. 3, 2016) (stating "we need not address whether *Nassar* changed our analysis of retaliation claims at summary judgment"). However, another recent Eleventh Circuit decision addressing a summary judgment ruling, which cited *Nassar*, stated that the plaintiff's "burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse action." *Adams v. City of Montgomery*, 569 Fed. App'x 769, 773-74 (11th Cir. 2014). Thus, the *Adams* decision implies that the analysis at summary judgment has not changed. Consequently, having shown a close temporal proximity between his protected activity and several adverse employment actions, Plaintiff has sufficiently established causation for his prima facie case.

C.    **Plaintiff Has Not Shown Pretext**

Assuming Plaintiff could establish his prima facie case, he has not established that the

City's legitimate, non-discriminatory reason for terminating Plaintiff was pretextual.  The City

has shown that it engaged in progressive discipline of Plaintiff as a result of problems with

Plaintiff's job performance and complaints against Plaintiff by fellow employees.  The

progression of the discipline complied with the City's written policy.  Thus, while Plaintiff was

terminated, the termination was the culmination of a series of progressive disciplinary actions,

which followed the City's written policies.  In order to prevent summary judgment, Plaintiff must

show that the reasons for Plaintiff's demotion, placement on administrative leave, and

termination, all of which occurred after the filing of his EEOC charge, were pretext for

retaliation.  Plaintiff has not done this.  Accordingly, summary judgment is appropriate.

In order to show pretext, Plaintiff must establish that either: (1) a discriminatory reason

more likely motivated his employer or (2) the employer's proffered reason is unworthy of

credence.  *See Jackson v. Alabama State Tenure Commission*, 405  F.3d 1276,1289 (11th Cir.

2005).  To do this, Plaintiff must meet the proffered reason "head on and rebut it ... [he] cannot

succeed by simply quarreling with the wisdom of that reason." *Brooks v. County Commission of

Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir.2006)).  Thus, in order to avoid summary

judgment a plaintiff must produce significantly probative evidence showing that both the reason

was false and that discrimination was the real reason. *Id.*

Plaintiff appears to be arguing that the City's proffered reason is unworthy of credence.

Specifically, Plaintiff points to other police officers who violated various City rules and policies

but who were not demoted or terminated.  However, none of Plaintiff's proffered comparators

are valid comparators. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)(in order to compare a plaintiff's treatment to that of another employee, the plaintiff must show that he and the other employee are similarly situated in all relevant respects, including whether he and the other employee are involved in or accused of the same or similar conduct). Importantly, Plaintiff has not presented any evidence that any of his proffered comparators had a lengthy disciplinary history, as Plaintiff did. Given that the City has produced evidence of a progressive disciplinary policy and that Plaintiff had a lengthy disciplinary history resulting in counseling, reprimands, a suspension, a demotion, and then termination, any valid comparator would need to have a similarly lengthy disciplinary history.[10] Based on the record evidence, none of the proffered comparators have such a history.[11]

---

[10]As set out above, Plaintiff's disciplinary history included problems completing administrative tasks, failing to follow policies, not properly reporting incidents through the chain of command, inappropriate behavior towards female employees, creating a sexually hostile working environment, sleeping on the job, and retaliating against a complainant.

[11]For each proffered comparator, Plaintiff offers only a single incident or single disciplinary action, except Major Mandelbloom. The incidents proffered are:
(1) Major Brooklen: A fellow employee filed a sexual harassment complaint against Major Brooklen, who is African-American, for making unwelcome sexual overtures, including text messages, numerous phone calls, asking her to wear a short skirt, and asking for a hug. Despite a finding of inappropriate behavior, the complaint was not sustained.
(2) Captain Lewers: A female employee filed a sexual harassment complaint against Captain Lewers, who is African-American, alleging unwelcome comments and that he had looked up the female employee's dress. The investigation found insufficient evidence that the employee believed that she would be hurt if she did not comply with Lewers' requests.
(3) Major Mandelbloom: A female employee accused Major Mandelbloom of inappropriate comments and touching. The complaint was not sustained because there was no independent corroboration of the incidents. (DE-53-52.) Another complaint was filed against Major Mandelbloom by a female employee about a comment Mandelbloom made to a male employee, who was dating the female employee. The male employee, to whom the comments were made did not find them offensive. The female only heard the

Plaintiff seems to focus on the egregious nature of some of the actions of his proffered comparators and attempts to compare that to his own, allegedly less egregious, actions. However, under the City's progressive disciplinary policy, the nature of the actions are not the sole determinant of the appropriate punishment; the number of past disciplinary actions are equally, or even more, relevant.  Plaintiff has not presented evidence that any of his proffered comparators were the subject of multiple disciplinary proceedings, except for the two unsustained complaints against Major Mandelbloom, or evidence that any of his proffered comparators had multiple violations of City policies that went unchecked. Consequently, none of the proffered comparators are valid comparators.  Because Plaintiff has not presented any evidence that other officers were treated differently after amassing a lengthy disciplinary record, Plaintiff has not shown that the City's proffered legitimate, non-discriminatory reason for demoting and then terminating him was pretextual.  Consequently, Plaintiff has failed to meet his burden on his Title VII claims.  Because the same standard applies to all of Plaintiff's claims, all

---

comments when they were relayed to her by the male employee.  The investigation found no malice by Mandelbloom and the comments were not found to be offensive.  (DE-53-51.)

(4) Officer Ruiz: A complaint was filed against Officer Ruiz for use of excessive force against a civilian and falsification.  While those allegations were not sustained, Officer Ruiz received a ten-day suspension for violating other policies.  (DE-54-44 & 54-45.)

(5) Officer Malone: Officer Malone resigned before the City was able to discipline him for his treatment of a civilian and violations of City policy.

(6) & (7) Sgt. Santiago and Officer McGeehan: Sgt. Santiago and Officer McGeehan were accused of failing to properly secure a crime scene resulting in missing money.  The complaint was sustained but Plaintiff has not presented any evidence regarding the discipline they received.

(8) Officer Barney: A complaint against Officer Barney alleging that he provided misleading information to law enforcement officials and interfering with a police investigation was sustained.  He received a five-day suspension.

of his claims fail.[12]

### D.   Plaintiff's §§ 1981 and 1983 Claim Also Fails Because Plaintiff Has Not Shown a Custom or Policy

Even if Plaintiff's § 1983 claim did not fail for the reasons set forth above, it would still fail because Plaintiff has not established an essential element of a § 1983 claim – a custom or policy.  Section 1981 prohibits racial discrimination in the making and enforcement of contracts. 42 U.S.C. § 1981.  When a plaintiff seeks damages from a state actor for a violation of rights under § 1981, § 1983 provides the exclusive remedy.  *Jett v. Dallas Independent School District*, 491 U.S. 701, 735 (1989).  Thus, to prevail on a § 1981 claim for damages against a state actor, a plaintiff "must show that the violation of his 'right to make contracts' protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases." *Id.* at 735-36. Plaintiff has not presented any evidence of a custom or policy of retaliating against employees who engage in activity protected by Title VII.  The only evidence Plaintiff has presented is of employees who were allegedly retaliated against for complaining about the Quota Policy. However, as set out above, that is not protected activity under Title VII.  Consequently, Plaintiff's claim under § 1983 fails for the same reasons as his claim under Title VII and because Plaintiff has not set forth a custom or policy of retaliation.

Accordingly, it is

ORDERED that:

---

[12]Plaintiff argues that the protections of § 1981 are broader than those of Title VII and, thus, include claims not based on employment practices.  Plaintiff, however, has not cited any authority to support this proposition, nor has the Court found any.

1.  Defendant, City of Miami Garden's Motion for Summary Judgment [DE-43] is

GRANTED.

2. The Court will enter a separate judgment.

3. All pending motions not otherwise ruled upon are denied as moot.

4. This case is CLOSED.

DONE and ORDERED in Miami, Florida, this _1st_ day of June, 2016.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:    All Counsel of Record